[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14089
Non-Argument Calendar
_____

D.C. Docket No. 2:16-cv-00230-WKW-GMB


PONCE D. HOWARD,

                                                          Plaintiff-Appellant,

versus

HYUNDAI MOTOR MANUFACTURING ALABAMA,

                                                          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(October 26, 2018)

Before MARTIN, JILL PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

Ponce D. Howard appeals, *pro se*, from the district court's grant of summary judgment to his former employer Hyundai Motor Manufacturing Alabama ("Hyundai") in his race discrimination lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).  On appeal, he argues that the district court erred in concluding that he failed, in stating his prima facie case of racial discrimination, to identify a similarly situated comparator outside his protected class who was treated more favorably or to show that Hyundai's termination of him for workplace violence was pretext for race discrimination.

At all times relevant to this appeal, Hyundai operated an automobile manufacturing facility in Montgomery, Alabama.  In June 2012, Hyundai hired Howard to work as a paint inspector.  In February 2015, Hyundai terminated Howard's employment following an investigation stemming from a workplace confrontation involving Howard and one or more of his coworkers.

Howard, who is black, alleged in his complaint that Hyundai discriminated against him on account of his race when it terminated his employment.  In his complaint, Howard alleged the following facts surrounding a February 2015 incident between himself and a white coworker, Josh Denham.  Denham began verbally attacking him for taking sick leave due to an illness and then gave Chris Arnold, a white supervisor, a broken tool to give to Howard as a part of the harassment.  Denham continued the harassment, telling Howard that he would have

2

him fired and that Arnold and another white supervisor, Jeff Todd, would serve as his witnesses to the argument. Arnold then went to inform the Team Relations Department about the incident and, upon his return, pulled Todd and Denham to the side to tell them what to say when reporting the incident to Team Relations. Then, "one by one," they reported the incident to Team Relations, saying what Arnold had told them to say. There were eight black people who witnessed the argument, including Irvin Smith and Carmen Paschal. Howard was ultimately discharged due to the argument after a meeting with Team Relations. While a white manager was present at the meeting, neither his black manager, nor his black supervisor was present. Additionally, he was not given a hearing prior to his termination, as required by Hyundai's Human-Resources manual. Denham was not fired, and was instead transferred to "Hyundai Transformer." Howard also attached his Equal Employment Opportunity Commission ("EEOC") charge of discrimination.

After conducting discovery, Hyundai filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, arguing, of relevance, that Howard failed to state a *prima facie* case of racial discrimination and that all of its actions were taken for legitimate, nondiscriminatory, and non-pretextual reasons. Hyundai asserted that, as a result of its investigation of the 2015 incident—during which it interviewed numerous individuals in addition to Arnold, Howard, and Denham—it had

3

determined that Howard had twice thrown a tool at Denham and made threatening statements and gestures towards Denham, which violated its Workplace Threats and Violence Policy and its Serious Misconduct Policy. Hyundai asserted that, at the time of Howard's violation, he had been subject to a probationary Serious Misconduct Letter (also known as a Letter of Conditional Employment), which had been issued in response to his prior violation of the Workplace Threats and Violence Policy in August 2013, such that his new violations warranted termination. Hyundai further indicated that Denham was also terminated after an investigation of him related to the 2015 incident concluded that he had violated its Harassment Policy and Serious Misconduct Policy. Hyundai asserted that Denham was not "transferred" to another job within the Hyundai Motor Manufacturing Alabama company, and that Hyundai Power Transformers ("HPT") was a completely different company. Accordingly, Hyundai argued that Howard could not meet his burden to show that it did not actually believe he engaged in workplace violence and instead intended to discriminate against him, as he had merely argued with the conclusions of Team Relations and Human Resources, and offered no basis upon which to believe that its decision to terminate him was a product of discrimination.

Also in support of its summary judgment motion, Hyundai submitted numerous exhibits, including (1) Howard's deposition; (2) the declaration of Rick

Neal, the Senior Vice President of Human Resources and Administration, who was white; (3) the declaration of Robert Clevenger, the Manager for Team Relations; and (4) all referenced exhibits. The following facts were set out by Clevenger's and Neal's declarations, Hyundai's internal investigation memoranda relating to the 2013 and 2015 incidents, Hyundai's official disciplinary policies, and Howard's Letter of Conditional Employment. According to Hyundai's official policies, Serious Misconduct Offenses—which include, for example, harassment and workplace violence—were punished outside of the normal process and resulted in either termination or a Letter of Conditional Employment. The Letter remained active for three years and required the employee to remain incident-free. After an investigation into the 2013 incident, Team Relations found that Howard made derogatory and threatening remarks to a black coworker, concluded that he had violated the Workplace Threats and Violence Policy and engaged in Serious Misconduct, and issued him a Letter of Conditional Employment instead of firing him.

On the day of the 2015 incident, both a black supervisor and Denham separately made complaints against Howard about the incident. Team Relations investigated the incident by interviewing and taking statements from employees who witnessed the incident, including Denham, Arnold, Smith, and Paschal. They made the following statements. Denham stated that Howard had twice thrown the

5

tool at him, hitting him in the leg one time, that Howard then got in his face and made fists and told him that he would beat him up, and that he made a gesture in the shape of a gun and said, "I'm going to come to your house and boom" and "I'll be in prison, but you'll be in the grave." Arnold stated that, after he gave the tool to Howard, he turned his back to walk away and then heard them start to argue. Arnold stated that he saw Howard approach Denham's work area to intimidate him and heard him threaten to beat Denham up, but that he did not see Howard make any gestures towards Denham. Howard's statement was similar to the allegations from his complaint, adding that he threw the tool "up the line towards the upgrader station" upon realizing that it was broken, that Denham cursed at him, and that he never threatened Denham. Smith corroborated the story that, after teasing and provocation by Denham, Howard twice threw the tool toward Denham and made threatening statements and gestures at him. Paschal stated that she had tried to calm Howard down and that Denham had been regularly harassing him.

Based on these interviews, Team Relations found the following: (1) Denham gave Arnold a broken tool to give to Howard; (2) Howard twice threw the tool in Denham's direction; (3) Denham told Howard "you are gone[;] that's your job"; (4) Howard walked over to Denham, made a fist gesture at him, and threatened to beat up and kill Denham; and (5) Denham instigated the incident and had harassed Howard on a daily basis. Team Relations also compared Howard's actions with

6

others who had been separated for Workplace Violence infractions to ensure consistency of punishment. Neal was the ultimate decision-maker as to whether Howard would be fired. Upon review of the investigation and Howard's disciplinary history, Neal determined that Howard's actions during the 2015 incident amounted to workplace violence, which was a Serious Misconduct Offense, and decided to fire Howard. Neal's decision was not influenced by Howard's race, and no one in the Employment Review Committee disputed the investigatory findings or termination decision.

Neal also conducted an investigation of Denham related to the 2015 incident and fired him because Denham also had previously been issued a Letter of Conditional Employment and his actions during the 2015 incident amounted to workplace violence, a Serious Misconduct Offense. Finally, HPT was not a subsidiary, affiliate, or parent of Hyundai Motor Manufacturing Alabama, and the two did not transfer employees.

Howard testified in his deposition to the following. At the time of the 2015 incident, he was on the Letter of Conditional Employment based on the 2013 incident, which he conceded had nothing to do with race. As to the 2015 incident, Denham and Todd were harassing him, and Arnold stood by, laughing. Arnold handed him the tool, which he threw in the trash can upon realizing that it was broken. He did not curse at, or threaten, Denham. Arnold went to Team Relations,

7

and then pulled Denham and Todd aside. Howard believed that Arnold, Denham, and Todd collaborated to tell Team Relations the same story against him, but conceded that he did not actually hear them do this and just made an assumption because their stories matched. Nothing was said about his race on this occasion. While Denham had made derogatory racial remarks to him, no one else at Hyundai had ever done so. Further, he agreed that he had no reason to believe that any of the individuals listed on the 2015 investigation memorandum prepared by Team Relations—including Neal and Clevenger—disfavored him because he was black. After Howard's termination, Denham started working for HPT, which he assumed constituted a transfer because both companies had "Hyundai" in the name. He believed that his termination was based on his race because he was fired and Denham was not, and because his white supervisors did nothing about Denham's harassment of him.

Howard responded to Hyundai's motion for summary judgment, arguing that he could establish a *prima facie* case of race discrimination and that Hyundai's proffered reason was a pretext for discrimination. In relevant part, he argued that he could establish pretext by arguing with the conclusions of Team Relations as to the 2015 incident and did so by adamantly denying that he committed workplace violence against Denham, and by claiming that he was not fired on the basis of his second Serious Misconduct Offense because Denham was not fired even though he

8

had at least five prior reports of workplace violence and harassment.  He asserted that swifter and stronger action was brought against him after the 2015 incident than after the 2013 incident because the 2015 incident involved a white victim and the 2013 incident involved a black victim.

In support, Howard submitted declarations from himself, Smith, and Paschal.  His declaration largely set out his prior allegations, adding that he believed that Denham attacked him during the 2015 incident because of his race, and that he had testified in his deposition that he had no reason to believe that two particular supervisors with whom he was familiar disfavored him because he was black, but that he did not know the other listed supervisors, including Clevenger and Neal.  Smith declared that he saw Howard throw the tool "up the line," but did not see him throw the tool at Denham, and that Denham and his two friends regularly made derogatory statements to Howard.  In addition to the statements she provided in her investigatory interview, Paschal declared that she did not observe Howard taking any threatening actions against Denham during the 2015 incident, and that Denham had a history of making derogatory statements to coworkers and was only disciplined once.

Upon review, a magistrate judge issued a report and recommendation ("R&R"), recommending granting summary judgment in favor of Hyundai and dismissing Howard's complaint.  More specifically, the R&R concluded that (1)

9

Howard failed to state a *prima facie* case of racial discrimination because he failed to show that he was treated less favorably than a similarly situated individual outside of his protected class, and (2) even so, Hyundai had proffered a legitimate, nondiscriminatory reason for his termination, and he failed to submit sufficient evidence suggesting both that its proffered reason was pretextual and that its true motivation was based on race.

Howard objected to the R&R, arguing that it erroneously: (1) failed to focus on the overwhelming evidence that Denham had a long history of harassing Hyundai employees, which Hyundai failed to respond to; (2) weighed the evidence in Hyundai's favor and made improper credibility determinations; and (3) found that Hyundai's objections to his declaration should be sustained. The district court overruled the objections, adopted the R&R, and granted its summary judgment motion and dismissed with prejudice Howard's complaint. Howard filed a motion entitled "Motion for reconsideration and to alter order and judgment," reiterating his argument that the district court erred in adopting the R&R because it misapplied the summary judgment standard by crediting Hyundai's allegations over his own and relying on disputed evidence as to whether he committed workplace violence during the 2015 incident and whether he suffered discrimination. The district court construed Howard's motion as being brought

10

pursuant to Fed. R. Civ. P. 59(e) and denied the motion because he failed to present any newly discovered evidence or show any manifest error of law or fact.

Howard appealed and moved for leave to proceed on appeal *in forma pauperis* ("IFP"), which the district court denied.  Howard then moved this Court for leave to proceed on appeal IFP. We denied his motion on grounds that any appeal in this case would be frivolous.  Howard paid his court costs, and this appeal followed.

## I.

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court.  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010).  "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* at 1263–64.  A plaintiff must present more than a mere scintilla of evidence, and cannot rest his contentions on speculation or conjecture. *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1122 (11th Cir. 2014).

Briefs submitted by *pro se* litigants are construed liberally.  *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).  Notwithstanding this liberal construction, however, issues not briefed on appeal by a *pro se* litigant are deemed

abandoned, and we do not address arguments raised for the first time in a *pro se* litigant's reply brief. *Id*.

Under Title VII, it is unlawful for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish discrimination through direct evidence, circumstantial evidence, or statistical proof. *Alvarez*, 610 F.3d at 1264. When evaluating a discrimination claim based on circumstantial evidence, we primarily apply the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[1] *Id*. Under this framework, a plaintiff is first required to establish a *prima facie* case of discrimination. *Id*. To establish a *prima facie* case of discrimination, a plaintiff may show that (1) he is a member of a protected class; (2) who is qualified for the position; (3) but was subject to an adverse employment decision; and (4) a similarly situated employee who is outside the protected class was treated more favorably. *Alvarez*, 610 F.3d at 1264.

If the plaintiff establishes his *prima facie* case, the burden then shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its

---

[1] This Court has noted that establishing the elements of the *McDonnell Douglas* framework is not the only way to survive summary judgment in an employment discrimination case, and that a plaintiff may also present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quotation marks omitted).

action. *Alvarez*, 610 F.3d at 1264. If the defendant produces such evidence, the burden shifts then back onto the plaintiff, who must produce evidence that the employer's proffered reason is actually a pretext for discrimination. *Id.* "[T]he ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against [him]." *Id.*

If the defendant's proffered reason is one that would motivate a reasonable employer to take the adverse action, the plaintiff "must meet that reason head on and rebut it," and cannot prove pretext by recasting the defendant's reason or by substituting his business judgment for the defendant's. *Id.* at 1265–66 (noting that the pretext inquiry focuses on the employer's and not the employee's belief).

A plaintiff can show that an employer's justification of his termination based on his violation of a work rule is arguably pretextual by submitting evidence that: (1) he did not violate the work rule, or (2) if he did violate the rule, other employees outside the protected class who similarly violated the rule were not similarly treated. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999). The plaintiff must show both that the proffered reason was false, and that discrimination was the true reason for the adverse action. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

II.

13

The district court properly granted summary judgment because Howard failed to state a *prima facie* case of racial discrimination.  In applying the *McDonnell Douglas* framework, we note that there is no dispute regarding the first three elements of our analysis. Howard is a member of a protected class because he is black.  Hyundai does not allege he was not qualified for his position as a paint inspector.  Finally, Howard was subject to an adverse employment decision when Hyundai terminated his employment following the 2015 incident.  It is with respect to the final element of the analysis—the presence of a comparator outside the protected class who received more favorable treatment—that the parties differ.

Taken as a whole, Howard's pleadings raise the prospect of three potential comparators: Denham, Todd, and Arnold.  Hyundai responds by arguing that each of Denham, Todd, and Arnold is not an appropriate comparator because he is not similarly situated to Howard (Denham, as best we can tell, because his disciplinary history differs slightly from Howard's, and Todd and Arnold because they played no significant role in the 2015 incident).  With respect to Denham, we can assume *arguendo* that he is an appropriate comparator.

Todd and Arnold, on the other hand, are not appropriate comparators.  When determining whether employees are similar for purposes of the Title VII "similarly situated" analysis, this Court considers "whether the employees are involved in or accused of the same or similar conduct . . . ."  *Holifield v. Reno*, 115 F.3d 1555,

14

1562 (11th Cir. 1997). Although not dispositive, "[m]aterial differences in ranks and responsibilities are relevant for considering whether an employee is a proper comparator." *Cyprian v. Auburn U. Montgomery*, 799 F. Supp. 2d 1262, 1282 (M.D. Ala. 2011) (citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280–81 (11th Cir. 2008)). The disciplinary histories of the plaintiff and the proposed comparator also are relevant to our inquiry. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1318–19 (11th Cir. 2003) (finding two employees to not be similarly situated where one employee's documented history of misconduct was "much worse . . . in both number and nature").

We are ultimately persuaded that Todd and Arnold are not appropriate comparators because they are not accused of conduct that is the same or similar to Howard's. In fact, the record indicates only that Arnold handed Howard a non-functioning tool as part of a practical joke and later laughed as events unfolded. As for Todd's part in the encounter, Howard speculates that Todd told Denham and Arnold what to report to Team Relations about the event, but Howard also admits that he did not hear a word that any of Denham, Arnold, or Todd spoke during their huddle. Importantly, there is no indication in the record of either Arnold or Todd using profane language, threating anyone, or throwing objects towards their coworkers. Howard even admits that other than their limited involvement in the 2015 incident, Arnold and Todd essentially ignored him.

15

Moreover, Todd is not even mentioned in the Team Relations memorandum interviewing witnesses to the 2015 incident, and neither Todd nor Arnold appears to have been subject to any Letter of Conditional Employment at the time of the 2015 incident.  As the magistrate judge's R&R properly emphasized, "Todd's and Arnold's relevant conduct amounts to ignoring Howard, giving him menacing looks, huddling to speak with Denham following the incident . . . , and otherwise failing to stop Denham's harassment of Howard."  Because Denham is the only proper comparator, we proceed to determine whether he received treatment that was more favorable than that afforded Howard.

In relevant part, Howard argues that Hyundai treated Denham more favorably following the 2015 incident because Hyundai (1) did not fire Denham promptly after the incident occurred, (2) assisted in arranging Denham's transfer to HPT, which Howard believed to be a related company, and (3) failed to appropriately address the earlier harassment Denham inflicted on Howard and other employees.  Hyundai responds by noting that it also terminated Denham for his part in the 2015 incident shortly after terminating Howard; that Hyundai and HPT are unrelated corporate entities that do not transfers employees to one another; and that Howard never properly notified Hyundai of Denham's earlier harassment.

16

Even construing the evidence in a light most favorable to Howard, we find that Denham was not treated more favorably than Howard after the 2015 incident. To begin, it is clear that Hyundai also fired Denham shortly after the 2015 incident. Once Hyundai concluded its investigation of Howard, Neal, Hyundai's Senior Vice President of Human Resources and Administration, ordered an investigation of Denham's role in the incident. Hyundai then undertook an investigation of Denham that, as in Howard's case, culminated in the development of a detailed memorandum describing the company's findings. The memorandum is dated March 2, 2015, only six days after the Howard memorandum. Like the Howard memorandum, the Denham memorandum detailed relevant witness testimony from many of the same witnesses who were present during the incident. It reached written conclusions where facts were supported by the testimony of two or more witnesses. It recounted Denham's disciplinary history, including the fact that he was subject to an active Letter of Conditional Employment. Finally, it presented the Hyundai policy at issue. After reviewing the findings, and without any notice that Howard might file an EEOC complaint or lawsuit, Neal determined that Hyundai should terminate Denham's employment, which it ultimately did.

We also disagree with Howard's assertion that Hyundai treated Denham more favorably by aiding in his "transfer" to HPT. It is uncontroverted that Hyundai and HPT are separate legal entities. Howard does not dispute Hyundai's

17

claims that neither entity is a subsidiary, affiliate, or parent of the other and that the two entities do not share or transfer any management or employees, so we accept them as true. Most importantly, we find no evidence in the record that Hyundai actually transferred Denham or otherwise assisted him in obtaining employment with HPT.[2] Consequently, we find no disparate treatment on this ground.

Lastly, we find no disparate treatment in Hyundai's alleged failure to address Denham's earlier harassment. First and foremost, Howard testified in his deposition that he never formally reported any harassment or discrimination, involving Denham or otherwise, before the 2015 incident. Given this, it is hard to conclude that Hyundai should be faulted for failing to take action regarding Denham's earlier alleged misbehavior. *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000) (concluding that an employer cannot be said to be on notice of alleged harassment unless it is reported to individuals designated in its anti-harassment policy). Additionally, a review of Denham's documented disciplinary history as set forth in the March 2, 2015 Team Relations memorandum reveals a series of relatively minor infractions and two incidents of Serious

---

[2] We also refuse Howard's invitation to take judicial notice of the fact that, in most employment situations, an applicant is required to submit the name of his or her last employer to the new employer. Apart from the fact this this is not the kind of thing about which courts ordinarily take judicial notice, *see Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (describing well-known scientific facts, matters of geography, and matters of political history as typical examples of judicially noticeable information), we note that during his deposition Howard himself admitted to leaving two of his prior employers off the employment application he submitted to Hyundai. Moreover, Howard also failed to show us any similar case so extending the doctrine of judicial notice, and we decline to do so here.

18

Misconduct involving an altercation and, separately, inappropriate behavior towards other Team Members.  Denham received Letters of Conditional Employment on each occasion, the first of which was inactive by the time of the 2015 incident.  All in all, we take this as evidence that Hyundai was doing its best to fairly manage a difficult employee, but nothing in the record suggests that Hyundai departed from its documented procedures and afforded Denham any special treatment it did not later afford Howard.  In particular, the record does not reveal that Denham committed any Serious Misconduct while subject to an active Letter of Conditional Employment and was permitted by Hyundai to keep his job. Accordingly, we find no evidence of disparate treatment on this ground either.

Ultimately, we agree with the magistrate judge and the district court that Howard has not met his burden of demonstrating that a similarly situated employee outside his protected class was treated more favorably.  As a result, he has failed to establish a *prima facie* case of race-based employment discrimination, and the district court did not err in granting Hyundai's motion for summary judgment.

### III.

Although our analysis could end with the finding that the district court did not err in granting summary judgment because Howard failed to establish a *prima facie* case of race discrimination, we write briefly to address his argument that Hyundai's proffered work-rule-violation reason was pretext for discrimination.

19

Assuming, for the sake of argument, that Howard established a *prima facie* case of race discrimination, Hyundai has articulated and produced evidence of a legitimate, nondiscriminatory reason for its termination of him—its determination that he had violated its Workplace Threats and Violence Policy and its Serious Misconduct Policy while he was already subject to a Letter of Conditional Employment. *See Alvarez*, 610 F.3d at 1264; *Jones*, 874 F.2d at 1540. Because violating established policies by engaging in workplace violence twice within a three-year period would motivate a reasonable employer to fire an employee, the burden shifted back to Howard to produce evidence that Hyundai's proffered reason was actually pretext for discrimination. *See Alvarez*, 610 F.3d at 1264.

However, Howard has failed to prove that Hyundai's proffered work-rule-violation reason was pretext for discrimination. While he claimed both that he did not violate any policies during the 2015 incident and that Denham was not similarly punished for his violations of those same policies, Howard has produced no evidence showing that Hyundai's true reason for firing him was based on race. *See Damon*, 196 F.3d at 1363; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (noting that it must be "shown *both* that the reason was false, and that discrimination was the real reason"). Rather, he largely relied on his conclusory opinions and beliefs that Denham attacked him during the 2015 incident because of his race, that he received harsher treatment after the 2015 incident because the

20

victim was white and not black, and that he was ultimately fired because of his race. *See Alvarez*, 610 F.3d at 1264–65. Further, these conclusory opinions and beliefs are contradicted by: (1) his testimony that race was not mentioned during the incident; (2) his testimony that no one else from Hyundai other than Denham had ever made derogatory racial statements toward him; (3) his testimony that he had no reason to believe that at least some of the individuals listed on the Team Relations memorandum disfavored him because he was black; and (4) his failure to testify or otherwise produce any evidence that the remaining individuals listed on that memorandum did disfavor him because he was black.

In his arguments on appeal, Howard makes much of his own testimony that he did not actually threaten anyone or throw the worn-down tool at Denham during the 2015 incident. He argues that, because Hyundai's Team Relations memorandum reached different conclusions, there is a dispute of fact that should have precluded summary judgment. Hyundai responds by noting that the law does not require its conclusions regarding workplace misconduct to be free from error; instead, it only requires an employer's conclusions to be honestly made and free from evidence of unlawful discriminatory animus. Hyundai is correct.

We have said many times that we are not a "super-personnel department," and it is not our role to second-guess employers, "no matter how mistaken the firm's managers." *Id.* The fact that an employer's legitimate belief is or may

21

potentially be incorrect is immaterial so long as the employer's decisions were not ultimately shown to be motivated by unlawful discriminatory animus. *See id.* at 1266 ("The question to be resolved is not the wisdom or accuracy of [the employer's] conclusion that [the Title VII claimant's] performance was unsatisfactory, or whether the decision to fire her was 'prudent or fair.'"); *Damon*, 196 F.3d at 1363 n.3 ("An employer who fires an employee under a mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facie* case of disparate treatment by showing that it honestly believed the employee committed the violation."); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977) ("Even if [the employer] wrongly believed that [the Title VII claimant] violated this policy, if [the employer] acted on this belief it was not guilty of racial discrimination."). At the end of the analysis, our "sole concern is whether unlawful discriminatory animus motivated the decision." *Alvarez*, 610 F.3d at 1266 (quotation marks omitted).

After a careful review of the entire record, we are convinced that Hyundai decided to terminate Howard based on its honest belief that he violated its Workplace Threats and Violence Policy and its Serious Misconduct Policy while

22

subject to an active Letter of Conditional Employment. But even if Hyundai's conclusions regarding Howard's conduct during the 2015 incident were wholly or partially mistaken, it cannot be held liable for discriminatory conduct because Howard has also failed to point to any evidence that unlawful discriminatory animus actually motivated Hyundai's actions. Aside from the fact that Denham—who did not have the authority to terminate Howard's employment and played no part in Hyundai's decision to do so—had previously made derogatory racial remarks to Howard, and Howard's reference to his own skin color during the 2015 incident, the record presents no evidence that race actually played a part in any of the events leading to Howard's termination.

Further, Howard's failure to show any evidence that Hyundai's true reason for firing him was discrimination means that he also failed to show a "convincing mosaic of circumstantial evidence" raising a reasonable inference that Hyundai intentionally discriminated against him based on his race. *See Smith*, 644 F.3d at 1328.

## IV.

We hold that the district court properly granted Hyundai summary judgment and dismissed with prejudice Howard's complaint because he failed to establish a *prima facie* case of racial discrimination, and, even if the burden did shift to Hyundai, he failed to show that Hyundai's proffered legitimate, nondiscriminatory

reason for his termination was pretextual and that racial discrimination was the real reason for his termination.

**AFFIRMED**.[3]

---

[3] Howard's motion to seal the record on appeal is hereby DENIED.